**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MCI WORLDCOM NETWORK SERVICES, INC.; MCI WORLDCOM COMMUNICATIONS, INC; UUNET TECHNOLOGIES, INC., | : : : : : | **OPINION** |
| | : | Civ. No. 00-5255 (WHW) |
| Plaintiffs, | : : | |
| v. | : : | |
| GRAPHNET, INC., | : : | |
| Defendant. | : : : | |

**Walls, District Judge**

Plaintiffs MCI Worldcom Network Services, Inc., MCI Worldcom Communications, Inc., and UUNET Technologies, Inc., move to dismiss defendant Graphnet's amended Counterclaim and strike defendant's Third Party Complaint. Defendant cross-moves to dismiss the Second Amended Complaint or in the alternative for summary judgment. The Court heard oral arguments on these motions on April 22, 2005.

### FACTS AND PROCEDURAL BACKGROUND

The original plaintiff in this case, Worldcom, Inc., filed its Complaint in 2000 against Graphnet. Defendant moved to dismiss the Complaint and, on October 21, 2002, the Court issued an Order granting defendant's motion. That Order was appealed and the Third Circuit reversed the decision and remanded the case for further proceedings. On December 23, 2003, defendant filed its Answer with a Counterclaim against the original plaintiff, Worldcom, Inc. On May 20, 2004, defendant filed an Order to Show Cause seeking a temporary restraining order and

NOT FOR PUBLICATION

a preliminary injunction to keep Worldcom, Inc. from stopping service on certain

telecommunication lines.  At a hearing on July 8, 2004, the Court denied defendant's motion.

Thereafter, the parties entered into a Consent Order dated July 15, 2004, requiring, among other

things, that Worldcom, Inc. maintain services on such lines for a certain period of time.  The

Consent Order also allowed the parties to amend their pleadings.  More specifically, the July 15,

2004 Consent Order provided:

> Worldcom may amend the Amended Complaint to add additional claims and
> parties, including the proper parties in interest, for all claims held by Worldcom
> and its affiliates and successors against Graphnet, and Graphnet consents to such
> amendment of the Amended Complaint and will not object to such amendment on
> the ground that the Amended Complaint is untimely or prejudicial, except that
> Graphnet reserves any and all defenses it may have to any new claims or parties
> asserted in the Amended Complaint, as amended, including the right to move to
> dismiss and/or for summary judgment as to any claims advanced in such
> amendment.

(July 15, 2004 Consent Order at p.3.)  A similar provision was included for defendant to amend

its pleading.

**The Second Amended Complaint**

On August 3, 2004, a Second Amended Complaint was filed.  The plaintiffs named in the

Second Amended Complaint are MCI Worldcom Network Services, Inc., MCI Worldcom

Communications, Inc., and UUNET Technologies, Inc., none of whom were the plaintiff in all

the previous filings.  The Second Amended Complaint alleges: MCI, Inc., ("MCI") formerly

known as WorldCom, Inc. ("WorldCom") is the direct or indirect parent holding company of

Plaintiffs MCI WorldCom Network, MCI WorldCom Communications and UUNET, the real

parties-in interest in this action. All of the plaintiffs provide telecommunication services and

**NOT FOR PUBLICATION**

UUNET also provides internet services.  Graphnet provides communications services and network products for customers on a national and international basis.

The Second Amended Complaint begins with allegations concerning plaintiffs' bankruptcy proceedings:  While defendant's earlier motion to dismiss was pending, on July 21, 2002, MCI and plaintiffs filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On October 21, 2003, MCI and plaintiffs, together with other affiliates, filed their Debtors' Modified Second Amended Joint Plan of the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, Dated October 21, 2003 with the Bankruptcy Court. After further modification, the Bankruptcy Court confirmed the plan by Order dated October 31, 2003.  After certain conditions were met or waived, the confirmed plan became effective on April 20, 2004 ("Effective Date").  Section 10.01 of the confirmed plan provides that, upon the Effective Date, all properties of the estates of the WorldCom Debtors (as defined in the Confirmed Plan), including plaintiffs, would vest in the reorganized WorldCom Debtors (including the plaintiffs). According to the documents submitted by plaintiffs in support of their motion, defendant was scheduled as a creditor of MCI International, Inc., in the bankruptcy proceedings and for that reason, a copy of the October 9, 2002 notice of the commencement of the bankruptcy cases filed by the WorldCom Debtors was sent to defendant.  Similarly, a notice of the January 23, 2003 ("Bar Date") deadline for filing claims, dated November 12, 2002, was timely mailed to defendant at addresses in New York, New York and Teaneck, New Jersey on December 2, 2002. Publication notice of the Bar Date was also given. By Order dated May 28, 2003 ("Confirmation

NOT FOR PUBLICATION

Hearing Order"), the Bankruptcy Court set a hearing ("Confirmation Hearing") for the confirmation of the joint plan of reorganization filed by the WorldCom Debtors and directed that creditors be given notice of the Confirmation Hearing. Notice of the initial and adjourned Confirmation Hearings was timely mailed to defendant.

The Second Amended Complaint then alleges the facts underlying plaintiffs' claims:  On November 14, 1991, TRT/FTC Communications, Inc. ("TRT/FTC") and defendant  entered into an agreement (the "Telex Agreement") to provide two-way telex transmissions between their respective networks for telex traffic originating on each other's networks. This contract initiated a relationship or custom and practice between defendant and TRT/FTC (and TRT/FTC's corporate successors- in- interest, as defined below) pursuant to which they exchanged telex traffic between their respective networks and, over time, expanded the services to include the provision of "refile," "special transit," "indirect," or "least cost routing" telex transmission services to destinations around the world at varying rates and prices agreed to by the parties.

TRT/FTC subsequently changed its name to IDB WorldCom Services, Inc. ("IDB WorldCom"). In 1994, LDDS Communications, Inc. ("LDDS") acquired IDB Communications Group, Inc. ("IDB"), thereby acquiring IDB WorldCom, which, at that time, was a subsidiary of IDB. On June 30, 1999, IDB WorldCom was merged into MCI Communications Corp. ("MCI Communications"), a subsidiary of MCI.  MCI Communications is not a party to this action. As part of that merger, MCI Communications contributed the assets belonging to IDB WorldCom, including IDB WorldCom's rights under the Telex Agreement, to MCI WorldCom Network.

-4-

**NOT FOR PUBLICATION**

Thus plaintiff MCI WorldCom Network is the successor- in interest to TRT/FTC's rights and interests under the Telex Agreement.

From November 19, 1991, through and until 2000, TRT/FTC and/or its corporate successors-in-interest, including MCI WorldCom Network, provided telex transmission services to defendant under the Telex Agreement. Certain of these services were provided to defendant under two account numbers (the "Telex Accounts"). TRT/FTC and/or its successors-in-interest, including MCI WorldCom Network, invoiced defendant on a monthly basis through and until 2000, during which time period settlement packages were sent to defendant on a quarterly basis for the services provided pursuant to the Telex Agreement.  Plaintiffs allege that defendant has failed to pay in full for the services plaintiffs provided it and defendant is indebted to MCI WorldCom Network for no less than $3,126,026.25 for the services provided.

Defendant entered into another agreement (the "Service Agreement") with MCI WorldCom Communications, whereby MCI WorldCom Communications agreed to provide defendant with additional telecommunications services and equipment. Defendant received various telecommunications services and related equipment pursuant to the agreement. Those services were provided under another account number (the "Service Accounts").  Plaintiffs allege that defendant has failed to pay for the services and equipment received pursuant to the Service Agreement and defendant owes MCI WorldCom Communications at least $311,960.77.

Defendant also entered into various agreements (collectively, "Wholesale Agreements") with MCI WorldCom Communications whereby plaintiff agreed to provide defendant with international, interstate and local telecommunications services and associated equipment

-5-

**NOT FOR PUBLICATION**

pursuant to applicable tariffs (as identified and defined in the Wholesale Agreements) for resale to defendant's customers.  Included in the Wholesale Agreements is a WorldCom On-Net Services Agreement, effective as of October 8, 2001, between MCI WorldCom Communications and defendant.  Under a separate agreement (the "UUNET Agreement"), UUNET also agreed to provide defendant with telecommunications services and associated equipment for resale to defendant's  customers.  At least eight accounts (the "Wholesale Accounts") were set up by plaintiffs to provide services to defendant under these agreements.

Plaintiffs allege that defendant has failed to pay for the services it has received under the Wholesale Accounts.

Beginning by at least August 2003, MCI WorldCom Communications, on behalf of itself and UUNET, demanded payment from defendant of the money owed on the Wholesale Accounts.  Defendant responded by claiming that certain amounts demanded were incorrect. Over the course of the next nine months, MCI WorldCom Communications' Dispute Resolution Group researched and analyzed defendant's claims. Where appropriate, defendant received credit against its overdue invoices. In all, MCI WorldCom Communications determined that $4,923.38 (just over 1% of the amounts due) in credits were due to defendant. While researching defendant's claims, MCI WorldCom Communications demanded payment of additional amounts due on the Wholesale Accounts. According to plaintiffs, allowing for credits, defendant owes plaintiffs not less than $410,697.92 on the Wholesale Accounts, plus any additional amounts including, but not limited to, any applicable early termination penalties. This amount excludes

NOT FOR PUBLICATION

additional charges of $86,632.52 which are the subject of two disputes by defendant that are currently being analyzed by plaintiffs.

Based on these allegations, plaintiffs allege that defendant has breached the Telex, Service and Wholesale Agreements.   Plaintiffs also alleges claims for unjust enrichment based on services provided to defendant pursuant to these agreements.

In sum, the Second Amended Complaint made two principal amendments: First, plaintiffs added new parties, MCI WorldCom Communications and UUNET Technologies, Inc., to bring claims for amounts owed by defendant to plaintiffs under the Wholesale Accounts (Counts V through VIII of the Second Amended Complaint). The Wholesale Accounts included the accounts which were the subject of defendant's May 2004 preliminary injunction motion. Second, plaintiffs substituted MCI WorldCom Network for WorldCom, Inc. as the real party in interest for claims relating to the Telex Agreement, the subject of the original complaint (Counts I and II). Plaintiffs also substituted MCI WorldCom Communications for WorldCom, Inc. as the plaintiff for claims relating to the Service Agreement that was also the subject of the original complaint (Counts III and IV).

## The Amended Counterclaim and Third Party Complaint

Defendant filed an Answer to the Second Amended Complaint as well as a Counterclaim and Third Party Complaint against plaintiffs and third party defendants MCI International, Inc., MCI Communications, Inc., and MCI, Inc.  All of the claims are against all of the plaintiffs and the third party defendants.  The First Count alleges that the charges plaintiffs seek to recover under the agreements referenced in the Second Amended Complaint violate the Tele-

**NOT FOR PUBLICATION**

communications Act and reference charges and rates never filed with the Federal

Communications Commission ("FCC") in violation of the Telecom Act.  Defendant seeks

declaratory relief that the agreements are invalid and wants them rescinded.  The Second Count

alleges that plaintiffs violated the Telecom Act by acting unjustly and unreasonably and/or

discriminating against defendant by charging and seeking to collect unfiled rates and charges not

due.  The Third Count alleges that defendant and plaintiffs entered into the Telex Agreement and

an agreement for plaintiffs to provide defendant with the use of certain telecommunication lines

(the "Lines Agreement").[1]  Defendant says that on February 29, 2000, the parties entered into a

Settlement Agreement to settle and resolve all telex traffic between the parties.  Defendant

alleges that plaintiffs breached the Telex and Wholesale Agreements by charging defendant more

than what was owed, by refusing to apply credits, and by severing services.  Defendant also

alleges that plaintiffs breached the Settlement Agreement by instituting this lawsuit.  Defendant

wants specific performance of the Settlement Agreement.  The Fourth Count alleges that

plaintiffs breached the implied covenant of good faith and fair dealing with respect to the Telex,

Wholesale and Settlement Agreements. The Fifth Count alleges that plaintiffs made fraudulent

misrepresentations to defendant regarding the rates they would charge defendant, their intention

to settle billing errors and telex traffic issues, and that it would discontinue this litigation for

amounts owed under the Settlement Agreement.  The Sixth Count states a claim for negligent

---

[1] At oral argument, plaintiffs' counsel helpfully pointed out that what defendant refers to as the Lines Agreement is the same as the Wholesale Agreements referred to by plaintiffs; defendant did not dispute this statement.  For clarity purposes, the Court will refer to these agreements as the Wholesale Agreements.

**NOT FOR PUBLICATION**

misrepresentation.  The Seventh Count states a claim for intentional tortious interference with

defendant's customer agreements by bringing this lawsuit and severing services for certain tele-

communication lines.  The Eighth Count alleges a claim for intentional tortious interference with

defendant's prospective economic advantage. The Ninth and final count states a claim for unjust

enrichment.

## STANDARDS

### Standard for a Rule 12(b)(6) Motion to Dismiss

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to

accept as true all allegations in the complaint and all reasonable inferences that can be drawn

therefrom, and to view them in the light most favorable to the non-moving party.  Pinker v.

Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).  The question is whether the

claimant can prove any set of facts consistent with his or her allegations that will entitle him or

her to relief, not whether that person will ultimately prevail.  Hishon v. King & Spalding, 467

U.S. 69, 73 (1984).

While a court will accept well-pled allegations as true for the purposes of the motion, it

will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions

cast in the form of factual allegation.  See Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2

(1977).  Moreover, the claimant must set forth sufficient information to outline the elements of

his claims or to permit inferences to be drawn that these elements exist.  See Fed. R. Civ. P.

8(a)(2);  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The Court may consider the allegations

of the complaint, as well as documents attached to or specifically referenced in the complaint,

and matters of public record.  See Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d

213, 216 (3d Cir. 2003); see also 5B Wright & Miller, Federal Practice & Procedure §

1357 (3d ed. 1998).

"A 'document integral to or explicitly relied on in the complaint' may be considered

'without converting the motion [to dismiss] into one for summary judgment.'" Mele v. Federal

Reserve Bank of N.Y., 359 F.3d 251, 255 n.5 (3d Cir. 2004) (citing In re Burlington Coat Factory

Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  "Plaintiffs cannot prevent a court from looking

at the texts of the documents on which its claim is based by failing to attach or explicitly cite

them."  Id.

**Standard for Summary Judgment**

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary

judgment unless it is both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the

non-movant and it is material if, under the substantive law, it would affect the outcome of the

suit. See id. at 248. The moving party must show that if the evidentiary material of record were

reduced to admissible evidence in court, it would be insufficient to permit the non-moving party

to carry its burden of proof. Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts in question."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party

-10-

must set forth specific facts showing a genuine issue for trial and may not rest upon the mere

allegations or denials of its pleadings. <u>Shields v. Zuccarini</u>, 254 F.3d 476, 481 (3d Cir. 2001).  At

the summary judgment stage the court's function is not to weigh the evidence and determine the

truth of the matter, but rather to determine whether there is a genuine issue for trial.  <u>See</u>

<u>Anderson</u>, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the

light most favorable to the non-moving party. <u>Curley v. Klem</u>, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

As noted, pursuant to the July 15, 2004 Consent Order, WorldCom Inc., and defendant

were permitted to amend their pleadings.  Both parties did so and plaintiffs substituted

themselves as the real parties in interest with regard to the claims originally brought by

WorldCom, Inc. in 2000.  While defendant would have the Court view the Second Amended

Complaint as a completely new complaint because of the substitution of the real parties in

interest, the Court finds that the Second Amended Complaint properly substituted the real parties

in interest and, thus, the Second Amended Complaint relates back to the date the original

complaint was filed.

Fed. R. Civ. P. 17(a) and 15(c) allow substitution of real parties in interest and such

amendment relates back to the original complaint:

> Every action shall be prosecuted in the name of the real party in interest. An
> executor, administrator, guardian, bailee, trustee of an express trust, a party with
> whom or in whose name a contract has been made for the benefit of another, or a
> party authorized by statute may sue in that person's own name without joining the
> party for whose benefit the action is brought; and when a statute of the United
> States so provides, an action for the use or benefit of another shall be brought in
> the name of the United States. No action shall be dismissed on the ground that it is
> not prosecuted in the name of the real party in interest until a reasonable time has
> been allowed after objection for ratification of commencement of the action by, or

-11-

joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed. R. Civ. P. 17(a).  Rule 15(c) provides:

An amendment of a pleading relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The last line of Rule 17(a) reads a "substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."  "Rule 15(c) has been used in conjunction with Rule 17(a) to enable an amendment substituting the real party in interest to relate back to the time the original action was filed."  6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1555. Courts have interpreted Rule 17(a) to permit substitution of the real party in interest as the plaintiff if the plaintiff can show that the original plaintiff brought the case in its own name "as the result of an honest and understandable mistake."  Feist v. Consolidated Freightways Corp., 100 F. Supp. 2d 273, 276 (E.D.Pa.,1999).  The Advisory Committee Notes to Rule 17(a) support this interpretation: "It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Furthermore, "[w]hen determination of the correct party to bring the action was not difficult and

-12-

when no excusable mistake was made, the last sentence of Rule 17(a) is inapplicable and the action should be dismissed." 6A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1555.

Plaintiffs argue that they did not discover the real parties in interest until the spring of 2004.  They contend that they were uncertain who the real parties in interest were until that time because of the many mergers that occurred during the decade following the 1991 execution of the initial contract between defendant and TRT/FTC relating to the telex services at issue.  At the oral hearing, plaintiff's counsel represented that because discovery in this matter was delayed by the earlier proceedings and an appeal to the Third Circuit, he did not discover the mistake under early in 2004.  In light of the many mergers, acquisitions and name changes that have taken place since the parties first contracted in 1991, the Court is persuaded that the failure to name plaintiffs as the real parties in interest sooner than the Second Amended Complaint was the result of an honest and understandable mistake.  Furthermore, while the Consent Order does not expressly permit substitution, it did allow plaintiff to "add parties, including the real parties in interest, for all claims held by WorldCom and its affiliates and successors . . . ." (July 15, 2004 Consent Order.)  The Consent Order also says that defendant "consents to such amendment . . . and will not object to such amendment on the ground that the Amended Complaint is untimely or prejudicial . . . ."  (Id.)  By consenting to the addition of parties, including the real parties in interest, this indicates that a substitution of parties was contemplated.

The analysis does not end here, however, as there are additional requirements that must be satisfied in order for an amended pleading to relate back to the date the original pleading was filed.  There are three requirements to be satisfied for an amended complaint to relate back when the amendment substitutes a new plaintiff for the original one: 1) "the amended complaint must

-13-

arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original  pleading;" 2) "there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them;" and 3) "undue prejudice must be absent." Allied Intern., Inc. v. International Longshoremen's Ass'n, AFL-CIO, 814 F.2d 32, 35-36 (1st Cir.1987) (citing Raynor Bros. v. American Cyanamid Co., 695 F.2d 382, 384-85 (9th Cir.1982); Staren v. American Nat'l Bank and Trust Co., 529 F.2d 1257, 1263 (7th Cir.1976); Unilever (Raw Materials) Ltd. v. M/T Stolt Boel, 77 F.R.D. 384, 390-91 (S.D.N.Y.1977)).

Plaintiffs argue that the criteria for application of the relation-back rule is satisfied because (1) defendant is not faced with "undue prejudice", (2) the claims based on the Telex Agreement and the Service Agreement in the Second Amended Complaint arise out of the same "conduct, transaction, or occurrence" in the original complaint, and (3) there is "a sufficient identity of interest" between the substituted plaintiffs, and WorldCom, Inc., and their respective claims.

With regard to whether the claims arise out of the same "conduct, transaction, or occurrence" in the original complaint, the allegations in the Second Amended Complaint concerning the Telex Accounts and the Service Agreement Accounts arise out of the exact same "conduct, transaction, or occurrence" as alleged in the original complaint.

As for the second element, whether there is a sufficient identity of interest between the original and new plaintiffs and their claims, plaintiffs rely on Young v. Lepone, 305 F.3d 1, 15 (1st Cir. 2002), where the court of appeals noted that a sufficient identity of interest has been found "when the original and added plaintiffs are a parent corporation and a wholly-owned

-14-

subsidiary."  Here, the original plaintiff, WorldCom, Inc., is the direct or indirect parent holding company of the substituted plaintiffs, a fact not disputed by defendant.  Under these circumstances, this element also is satisfied.

As to the third element, the Court finds that defendant is not unduly prejudiced by application of the relation-back rule.  First, while defendant did not waive any defenses it might have to the Second Amended Complaint, it did agree not to object to such filing on the ground of prejudice.  (July 15, 2004 Consent Order.)  Nor is there any indication that defendant would be prejudiced by the relation-back rule.  Although this action was originally filed in 2000, no discovery took place until late 2003 or 2004.  Depositions did not begin until after the Second Amended Complaint was filed and numerous depositions remain to be taken.  Defendant's counter-argument that its discovery and litigation strategy would have been different if it had been directed at the current plaintiffs rather than Worldcom, Inc. without stating how it would have been different does not persuade the Court to find undue prejudice here.

In its reply brief, defendant makes several arguments about the applicability of Rule 17(a).  Defendant first claims that Rule 17(a) is "designed to protect defendants who have been improperly named as defendants, not for plaintiffs seeking to insert new and different parties to circumvent the statute of limitations."  (Def.'s Reply at 7).  This is supported by case law: "The rationale of the rule is to protect the defendant from a multiplicity of suits, to allow defendant to present all his defenses, to protect defendant from multiple liability."  Pace v. General Elec. Co. 55 F.R.D. 215, 218 (W.D.Pa.1972).  See also Celanese Corp. of America v. John Clark Industries 214 F.2d 551, 556 (5th Cir. 1954) ("[T]he purpose of the practice long obtaining in the federal courts and now set forth in Rule 17 of the Federal Rules of Civil Procedure, 28 U.S.C.A., that

-15-

every action shall be prosecuted in the name of the real party in interest, is to enable the

defendant to avail himself of evidence and defenses that the defendant has against the real party

in interest, and to assure him finality of the judgment, and that he will be protected against

another suit brought by the real party at interest on the same matter."). Defendant argues that if

the Court were to adopt plaintiffs' position with respect to the substitution of the parties and the

relation back rule, it would actually harm defendant and run afoul of the purpose of the rule.

Defendant's failure to show how it is harmed by application of the relation-back rule, however, is

detrimental to defendant's argument.  And it cannot be argued that the rule may not apply to

plaintiffs under appropriate circumstances.  The Court is satisfied that plaintiffs' substitution was

proper and that the relation-back rule is applicable under the circumstances.  That said, the Court

finds that the Second Amended Complaint relates back to the date of the original complaint filed

in 2000.

**I.      Plaintiffs' Motion to Dismiss the Counterclaim and Third Party Complaint**

Plaintiffs offer four reasons why defendant's Counterclaim and Third Party Complaint

should be dismissed: (1) the claims were discharged in plaintiffs' bankruptcy proceedings; (2) the

claims were adjudicated by the July 15, 2004 Consent Order; (3) defendant has failed to

adequately plead claims for fraud and unjust enrichment; and (4) defendant did not seek leave of

Court to file its Third Party Complaint.

A.      Counterclaim and Third Party Complaint Discharged by Bankruptcy Proceedings

Plaintiffs first argue that the Counterclaim and Third Party Complaint should be dismissed because the claims were discharged in the WorldCom debtors'[2] bankruptcies and defendant is enjoined from litigating these claims.  Before addressing this argument, the Court first notes that at oral argument, it took judicial notice of documents related to the WorldCom debtors' bankruptcy court proceedings.  The documents include affidavits of service of certain relevant notices on defendant, orders setting confirmation hearing dates and the deadline for filing proofs of claim, and the order confirming the debtors' second amended joint plan of reorganization.

Moving on to plaintiffs' first argument, they charge that the claims that are the subject of defendant's Counterclaim and Third Party Complaint were discharged in the bankruptcy proceedings by the confirmation of the plan, and defendant is enjoined from litigating these claims. Plaintiffs rely on the following provision of the Bankruptcy Code, 11 U.S.C. § 1141(d)(1)(A):

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan--
>> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i)[3] of this title, whether or not--

---

[2] The WorldCom debtors include both the original party plaintiff to this action and the current plaintiffs.

[3] 11 U.S.C. § 502(g)-(i) provide as follows:
(g) A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
> (ii) such claim is allowed under section 502 of this title; or
> (iii) the holder of such claim has accepted the plan.

In other words, this section provides that except as provided in the plan of reorganization or the confirmation order, the confirmation of a plan discharges a debtor from debts arising before confirmation, including post-petition administrative claims. 8 COLLIER ON BANKRUPTCY, ¶ 1141.05 at 1141-17 (15th ed. 2003).

The documents from the bankruptcy proceeding show that on October 31, 2003, the Bankruptcy Court entered an order confirming the plan.  Furthermore, 11 U.S.C. § 1141(a) provides that a confirmed plan "bind[s] the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan." 11 U.S.C. § 1141(a).  Plaintiffs argue that under § 1141(a) and the confirmation order, defendant is bound by the plan.

The confirmation plan itself addresses the discharge of claims against the debtors and the discharge of the WorldCom debtors.  Section 10.02 of the plan provides for the discharge of all existing debts and claims against the debtors:

---

> (h) A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

> (i) A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

-18-

> Except as otherwise provided herein or in the Confirmation Order, the rights
> afforded in the Plan and the payments and distributions to be made hereunder
> shall be in exchange for and in complete satisfaction, discharge and release of all
> existing debts and Claims . . . against the Debtors or any of their assets or
> properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.
> . . . [U]pon the Effective Date, all existing Claims against the Debtors . . . shall be,
> and shall be deemed to be, discharged . . . and all holders of Claims . . . shall be
> precluded and enjoined from asserting against the Reorganized Debtors, or any of
> their assets or properties, any other or further Claim . . . based upon any omission,
> transaction, or other activity of any kind or nature that occurred prior to the
> Effective Date, whether or not such holder has filed a proof of Claim . . . .

It should be noted that defendant did not file a proof of claim in the bankruptcy proceedings.  It is

noted that at oral arguments, defendant's attorney acknowledged that his client had had notice of

the bankruptcy proceedings and for strategic reasons chose not to file any claims.  Section 10.03

of the plan further provides for the debts against the debtors to be discharged:

> Upon the Effective Date and in consideration of the distributions to be made
> hereunder . . . each holder . . . of a Claim . . . shall be deemed to have forever
> waived, released, and discharged the Debtors, to the fullest extent permitted by
> section 1141 of the Bankruptcy Code, of and from any and all Claims . . . rights
> and liabilities that arose prior to the Effective Date. Upon the Effective Date, all
> such persons shall be forever precluded and enjoined, pursuant to section 524 of
> the Bankruptcy Code, from prosecuting or asserting any such discharged Claim . .
> . .

As the effective date of the plan was April 20, 2004, plaintiffs argue that any claims that

arose before that date were discharged by the Bankruptcy Code, the Confirmation Order, and the

plan.  Plaintiffs also state that to the extent some of defendant's claims appear related to the

Wholesale Agreements that, the subject of last summer's Order to Show Cause, these are really

not affirmative claims but rather defenses to plaintiffs' claims regarding those agreements.

Defendant advances several reasons why its claims should not be dismissed: First, that

the Court should invoke the doctrine of equitable estoppel to prevent dismissal of its

Counterclaim and Third Party Complaint.  "Estoppel is 'an equitable doctrine, founded in the

fundamental duty of fair dealing imposed by law, that prohibits a party from repudiating a

previously taken position when another party has relied on that position to his detriment.'"

Casamasino v. City of Jersey City, 158 N.J. 333, 354 (1999) (quoting State v. Kouvatas, 292

N.J.Super. 417, 425 (App.Div.1996)). "To establish a claim of equitable estoppel, the claiming

party must show that the alleged conduct was done, or representation was made, intentionally or

under such circumstances that it was both natural and probable that it would induce action.

Further, the conduct must be relied on, and the relying party must act so as to change his or her

position to his or her detriment."  Miller v. Miller, 97 N.J. 154, 163 (1984) (citing Fidelity Union

Trust Co. v. Essex Cty. Mortgage Co., 130 N.J.Eq. 351, 353, 22 A.2d 296 (E. & A.1941)).

     Defendant argues that it relied on the representation of the original plaintiff in this action,

WorldCom Inc., that it was the proper party in interest, and that such reliance was justified as

WorldCom, Inc. was the named plaintiff for almost five years of litigation.  The only possible

detriment offered by defendant is its claim that its discovery and litigation strategy would have

been different if it had been directed at the current plaintiffs rather than WorldCom, Inc.

Defendant does not expand on what those differences would have been and plaintiffs point out

that discovery is ongoing in this matter.  Furthermore, as plaintiffs' counsel informed the Court at

oral argument, all the depositions in this matter did not take place until after the current plaintiffs

were named in the Second Amended Complaint and the current plaintiffs have already engaged

in at least some additional document production and disclosures with defendant.  The Court is

unconvinced that defendant has been unduly prejudiced by the substitution of the real parties in

interest.

Defendant also argues that it could not have filed claims in the bankruptcy proceedings against plaintiffs because it did not know they were the real parties in interest until now.  While plaintiffs counter that the burden was on defendant to conduct sufficient due diligence to determine the claims it has against the WorldCom debtors, the Court finds it more significant that defendant chose not to file a proof of claim even against WorldCom, Inc.  Defendant argues that it may have filed claims had it known that its claims were against the current plaintiffs rather than WorldCom, Inc.  However, defendant has failed to show the Court why its strategy would differ depending on who the debtor was.  As it were, the WorldCom debtors included the current plaintiffs and for purposes of the bankruptcy plan, the assets of all the WorldCom debtors were combined such that regardless of which WorldCom entity a creditor had a claim against, all the claims were paid out from one source of funds.  (Section 5.01 of the Confirmation Plan.)  More specifically, section 5.01(a) provides that "each and every Claim filed or to be filed in the Chapter 11 case of any of the WorldCom Debtors shall be deemed filed against the WorldCom Debtors, and shall be one Claim against and obligation of the WorldCom Debtors."  The Court agrees with plaintiffs that to the extent that defendant had valid claims against one or more of the WorldCom debtors, it was not imperative that the claim be filed against the "right" debtor.

Defendant's second argument as to why its claims should not be barred by the bankruptcy looks to exceptions to discharge under section 1141(d) found in 11 U.S.C. § 523(a).  Defendant argues that the following exceptions are relevant and applicable:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . (6) for

willful and malicious injury by the debtor to another entity or to the property of
another entity . . . or (19) that . . . (B) results from . . . (ii) any settlement
agreement entered into by the debtor.

11 U.S.C. § 523(a).

With regard to the first two exceptions offered by defendant, the Court finds defendant's

arguments unpersuasive.  As to the fraud claim, defendant appears to argue that the removal from

the case of the original plaintiff constitutes fraud under 11 U.S.C. § 523 (a)(2)(A).  It contends

that the substitution is fraudulent in that it was effected to avoid the impact of the statute of

limitations on the new plaintiffs' claims and to avoid the Settlement Agreement. Defendant also

claims that WorldCom's prosecution of the case for five years constitutes the "quintessential act

of prosecuting a case under false pretenses."  (Def.'s Reply at 2).   The Court does not see how

the statute can be read in the manner advanced by defendant.  As the Court reads it, the exception

is for a claim by a creditor that the debt owed it was obtained by the debtor under false pretenses.

In other words, a traditional claim for fraud.  Defendant is arguing that the substitution of the

party plaintiffs was fraudulent.  The Court is not persuaded that this is a kind of fraud

contemplated by the Bankruptcy Code.  Defendant next argues that WorldCom's substitution out

of the case constitutes a willful and malicious injury to defendant under 11 U.S.C. § 523(a)(6) by

unlawfully prohibiting defendant's ability to defend itself and prosecute its counterclaims.

Again, the Court does not agree that this is the kind of injury or claim contemplated by the

Bankruptcy Code.[4]

---

[4] With regard to defendant's claims for fraud and intentional torts found in the Fifth
through Eighth Counts of the Counterclaim and Third Party Complaint, these claims were
discharged by the bankruptcy proceedings despite the applicable exceptions listed in section
523(a) because section 523(c) provides that such debts are "automatically discharged unless the

-22-

As to the last exception that defendant claims, defendant charges that because its claims relating to telex traffic charges arise out of the Settlement Agreement, this debt was not discharged under 11 U.S.C. § 523(a)(19)(B).  While defendant fails to quote the language of the exception in full in their brief, the Court reviewed the statute in its entirety and discovered that this exception does not just except debts that result from any type of settlement agreement. Rather, a closer look at the statute reveals that the exception under 11 U.S.C. § 523 (a)(19) is not just for any debt that results from a settlement, but only for debts that arise out of a settlement agreement based upon the debtors violation of federal or state securities laws.  Section 523(a)(19) reads:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (19) that– (A) is for– (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; *and* (B) results from– (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding; (ii) any settlement agreement entered into by the debtor; or (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

In other words, section 523(a)(19) excepts from discharge "debts arising from a judgment, order or settlement agreement based upon the debtor's violation of certain federal securities laws, state securities laws or regulations under federal or state securities laws, or for common law fraud,

---

creditor to whom such debt is owed obtains a determination of the bankruptcy court that the particular debt is nondischargeable."  4 COLLIER ON BANKRUPTCY § 523.03.  Because there is no indication that defendant obtained such a determination from the bankruptcy court, these claims too were discharged.

-23-

deceit or manipulation in connection with the purchase or sale of any security."  4 COLLIER ON BANKRUPTCY § 523.01 (15th revised ed. 2004).  Because defendant does not argue, nor could it, that the Settlement Agreement here arose from plaintiffs violations of securities laws, this argument too must fail.  Defense counsel conceded as much at oral argument but sought to use the statute as an analogue.  The Court did not agree with that use.

The Court concludes that any of defendant's claims against plaintiffs that arose before April 20, 2004 were discharged by the Confirmation Plan, the Confirmation Order and the Bankruptcy Code.  Because the Court finds that some of defendant's claims were discharged by the bankruptcy proceedings, the Bankruptcy Code, the Confirmation Plan, and the order confirming the plan all require that defendant be enjoined from litigating these claims.  Section 524(a)(2) of the Bankruptcy Code provides that "[a] discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ."  Paragraph 18 of the confirmation order provides:

> Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against . . . any or all of the Debtors and other parties in interest . . . are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors with respect to any such Claim . . . , (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors on account of any such Claim . . ., (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan . . . .

The same provision is included in the plan at section 10.04.  Thus, to the extent defendant's

Counterclaim and Third Party Complaint state claims that arose before April 20, 2004, those

claims are dismissed.

      B.    <u>Claims Adjudicated by July 15, 2004 Consent Order</u>

Plaintiffs next charge that to the extent defendant argues that its Counterclaim and Third

Party Complaint contains claims that arose after April 20, 2004, defendant is estopped from

bringing that claim under the July 15, 2004 Consent Order.  As noted, the Consent Order came

about as a result of defendant's request for a preliminary injunction to stop WorldCom, Inc. from

disconnecting certain telecommunication services provided defendant under the Wholesale

Agreements.  After the Court denied defendant's request, the parties agreed to enter into the

Consent Order.  The Consent Order provides in relevant part:

> ORDERED that MCI WORLDCOM Communications, Inc. and/or WorldCom,
> Inc. and their affiliates ("WorldCom") agree to maintain telecommunications
> service to Graphnet for account numbers 1912, 00087077, 24390, 5293, 28203,
> 13549, and U02974 (the "Wholesale Accounts") through and including July 31,
> 2004 or such earlier date as may be agreed to and confirmed in writing by the
> parties, on which date WorldCom shall be permitted to disconnect and
> discontinue services on the Wholesale Accounts;
>
> ORDERED that WorldCom agrees to maintain telecommunications services to
> Graphnet of Account number 86336952 through and including August 31, 2004 or
> such earlier date as may be agreed to and confirmed in writing by the parties, on
> which date WorldCom shall be permitted to disconnect and discontinue services
> on account number 86336952.

(July 15, 2004 Consent Order.)

Plaintiffs contend that to the extent that defendant's claims are based on the allegations

that plaintiffs' disconnection of the services was wrongful, those claims are barred.  Plaintiffs

argue that under the Consent Order, they maintained services to defendant, and properly

disconnected them after the dates provided therein. They charge that defendant cannot now claim that the disconnection was unlawful when defendant specifically agreed to it and such action was authorized by this Court.

Defendant counters by charging that because the Consent Order involved the original plaintiff, defendant could not have waived any counterclaims against the new plaintiffs. Defendant relies on the law of waiver: "Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291 (1988). Because questions of waiver "are usually questions of intent," such factual determinations "should not be made on a motion for summary judgment." Id.

That argument is actually not necessary. The Court notes that the Consent Order allows defendant to add new claims to its pleading. To the extent defendant had new claims to assert against plaintiffs as a result of the discontinuation of certain telecommunications services, defendant is permitted to do so pursuant to the Consent Order. The Court concludes that the Consent Order does not preclude defendant from asserting claims that relate to the services terminated under the Consent Order.

        C.      Failure to Plead Fraud with Particularity

Plaintiffs next argue that the Court should dismiss the Fifth Count of the Counterclaim and Third Party Complaint, which states a claim for fraud, on the ground that it fails to plead fraud with particularity. Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to

satisfy Rule 9(b), a plaintiff must plead with particularity "the 'circumstances' of the alleged

fraud in order to place the defendants on notice of the precise misconduct with which they are

charged, and to safeguard defendants against spurious charges of immoral and fraudulent

behavior." Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting Seville Indus.

Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984)).  This requirement may

be satisfied two ways: First, a plaintiff can plead "the who, what, when, where, and how: the first

paragraph of any newspaper story."  Chubb Corp., 394 F.3d at 144 (quoting In re Advanta Corp.

Sec. Litig., 180 F.3d 525, 534 (3d Cir.1999)).  Second, the requirement can be satisfied through

"alternative means of injecting precision and some measure of substantiation into their

allegations of fraud." Lum, 361 F.3d at 223-24 (quoting Seville Indus. Machinery, 742 F.2d at

791 (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of

alleged fraudulent transactions and the nature and subject of the alleged misrepresentations)).

"Plaintiffs also must allege who made a misrepresentation to whom and the general content of

the misrepresentation." Id. (citations omitted).  The Third Circuit has held that allegations which

indicate the general content of a representation but fail to indicate who the speakers were or who

received the information are inadequate to meet the requirements of Rule 9(b).  Saporito v.

Combustion Engineering Inc.,  843 F.2d 666, 675 (3d Cir. 1988), vacated on other grounds, 489

U.S. 1049 (1989).

     The only factual allegations supporting defendant's fraud claim are:

26.  At relevant times hereto, MCI made certain representations to Graphnet that it
would charge Graphnet a certain rate, settle and resolve all of its billing errors,
that it would settle and resolve all telex traffic issues and that it would cease and
discontinue its litigation against Graphnet on any amounts alleged due for telex
traffic under the Settlement Agreement.

-27-

> 27.  MCI knew or should have known that its representations were false when made.

(Am. Countercl. & 3d Party Compl. at ¶¶ 26-27).  Earlier in the pleading, defendant defines "MCI" as referring to all the plaintiffs and the third party defendants as well as such entities parents, subsidiaries and affiliates.  (Id. at ¶ 8).

Defendant disputes this issue and points to one other factual allegation in the Counterclaim and Third Party Complaint to support its position that fraud has been adequately pled.  Defendant points to paragraph 18 which alleges that "on February 29, 2000, MCI entered into a settlement agreement . . . with Graphnet to settle and resolve 'all telex traffic' among and/or between the parties."  Defendant asks the Court to read these allegations together to conclude that defendant has alleged plaintiffs made the specific representation to cease and discontinue the litigation in the Settlement Agreement.

The Court finds that this claim falls far short of pleading fraud with particularity.  Even if the Court were persuaded by defendant's argument, it still fails to address the "when, where, and how" of other alleged misrepresentations.  Furthermore, defendant's argument that the speakers have been identified by using the term "MCI," a reference to all the plaintiffs and third party defendants hardly puts plaintiffs on notice of who made such representations.

Defendant requests leave to amend if the Court were to find defendant's pleading deficient, which it has.  As the Court informed defense counsel at the hearing, the Court would only grant defendant leave to amend if it found that any part of the claim was viable, not barred by the bankruptcy discharge.  Paragraph 28 of the Counterclaim and Third Party Complaint reads "Graphnet relied upon MCI's representations by continuing to utilize MCI's telecommunications

services, by entering into the Telex Agreement, the Lines Agreement and the Settlement

Agreement, by performing thereunder and by agreeing to waive and release certain claims against

MCI." From this allegation, it appears that defendant may have a fraud claim that arose after

April 20, 2004, though it is far from clear what the facts of that claim may be. The Court will

allow defendant to amend its fraud claim to the extent defendant can allege, with required

particularity, facts to support a fraud claim that arose after April 20, 2004.

        D.     Failure to Plead Elements of Unjust Enrichment

Plaintiffs next argue that defendant has failed to state a claim for unjust enrichment in the

Ninth Count of the Counterclaim and Third Party Complaint. Plaintiffs charge that defendant's

claim for unjust enrichment merely says that "MCI has been unjustly enriched" and fails to allege

the required elements of this claim. They contend that defendant has failed to allege what benefit

plaintiffs allegedly received or why plaintiffs retention of the purported benefit is improper.

Defendant has also failed to allege why and how it expected remuneration from plaintiffs for the

unspecified benefit plaintiffs allegedly received or that the plaintiffs' failure to provide

remuneration enriched them beyond their contractual rights.

Defendant responds that plaintiffs ignored that the paragraph before its claim for unjust

enrichment incorporates by reference all the previous allegations and that claim for unjust

enrichment states that it arises as a result of the foregoing conduct. Defendant argues that the

allegations show that plaintiffs received the benefit of the Settlement Agreement and the

Wholesale Agreements, but charged defendant more than the amounts owed.

"To establish unjust enrichment, a plaintiff must show both that defendant received a

benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN

Realty Corp., 135 N.J. 539, 554 (1994).  The doctrine requires a plaintiff to "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Id.

Neither party addresses the standard for pleading unjust enrichment.  Another court in this district recently wrote that "in order to state a claim for unjust enrichment, a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004).  Under the general rules of pleading, all the pleading party must do to state a claim is include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The Third Circuit has noted that "[a]s the Supreme Court noted in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), Rule 8 basically requires that a pleading provide sufficient notice to the defendant of the type of litigation that this involved."  Barnhart v. Compugraphic Corp., 936 F.2d 131, 135 (3d Cir. 1991).  Plaintiffs advance no law that would support a finding that defendant must plead a claim for unjust enrichment with the same particularity required as a claim for fraud.  For these reasons, defendant's unjust enrichment claim is upheld to the extent it states a claim that arose after April 20, 2004.

     E.     Leave to File a Third Party Complaint

The last argument advanced by plaintiffs is that the Third Party Complaint should be stricken because defendant did not obtain leave of Court to file it as is required by Fed. R. Civ. P. 14(a).  Rule 14(a) provides:

-30-

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer. Otherwise the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.

Plaintiffs argue that because defendant's Third Party Complaint was filed on November 2, 2004, more than ten days after defendant's original answer was filed on December 22, 2003, defendant needed to seek leave of Court to file such pleading and defendant did not do so.

In light of the language of the Consent Order allowing defendant to amend its pleading "to add additional claims and parties," the Court finds plaintiffs argument unpersuasive.  Just as the addition of the proper parties in interest contemplates a substitution of parties, the addition of parties by defendant contemplates the filing of a Third Party Complaint.  Thus, the Third Party Complaint may stand to the extent it states claims that arose after April 20, 2004.

In conclusion, plaintiffs' motion to dismiss the Counterclaim and Third Party Complaint is granted in part and denied in part.  Defendant's claims that arose before April 20, 2004 are dismissed and those arising after that date survive.  Defendant is granted leave to amend its Fifth Count within forty days of the date of this Opinion to the extent it can state a claim for fraud that arose after April 20, 2004.

## II.     Defendant's Cross-Motion to Dismiss the Complaint or for Summary Judgment

### A.     Judicial Estoppel

Defendant's first argument is that the Second Amended Complaint should be dismissed because of the substitution of the current plaintiffs for the original plaintiff, WorldCom, Inc.

Defendant invokes the doctrine of judicial estoppel to support its position.  "The judicial estoppel doctrine seeks to prevent a party from playing fast and loose with courts by asserting contradictory positions."  U.S. v. Vastola, 989 F.2d 1318, 1324 (3d Cir. 1993).  "A party who has gained an advantage by characterizing the law or facts involved in a case should not later be able to contradict that characterization in order to obtain a further advantage."  U.S. v. Kepner, 843 F.2d 755, 760 (3d Cir. 1988).

Defendant charges that plaintiffs have played "fast and loose" with the Court by taking advantage of the language in the Consent Order permitting the filing of a Second Amended Complaint to remove WorldCom, Inc. from this litigation when a counterclaim was pending against it and substituting the three current plaintiffs as the real parties in interest.  Defendant argues that the real reason for this substitution was plaintiffs' desire to avoid the impact of the two year statute of limitations and the Settlement Agreement described earlier.  Defendant argues that this Second Amended Complaint is really a new lawsuit and that trying to place the plaintiffs in the shoes of the original plaintiffs is a fraud upon the Court.  Defendant asks the Court to dismiss the Second Amended Complaint, or, at the very least, to award defendant attorneys' fees and costs for the time it spent defending the lawsuit brought by WorldCom, Inc.

For the reasons stated earlier, the substitution of plaintiffs is proper and does not amount to conduct which would warrant application of the doctrine of judicial estoppel.  Defendant's motion to dismiss the Second Amended Complaint on this ground is denied.  Defendant's motion for attorneys' fees and costs is also denied because it is meritless.

B.    Statute of Limitations

-32-

As to Counts I through IV of the Second Amended Complaint, defendant's statute of limitations argument is related to the application of the relation-back rule discussed previously. Defendant argues that because the new plaintiffs did not file their claims until August 3, 2004, their claims are barred by the applicable statute of limitations.[5]

However, when the relation-back rule applies, which it does here, it ameliorates the effect of statutes of limitations. <u>Nelson v. County of Allegheny</u>, 60 F.3d 1010, 1015 (3d Cir. 1995). The goal of relation-back principles is "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." Fed. R. Civ. P. 15 Advisory Committee Note (1991). Having already decided that the substitution was proper and that the relation back rule applies, the Court finds this statute of limitations argument also without merit.

With regard to Counts IV through VIII, plaintiffs claim that these claims arising under the Wholesale Agreements became ripe only after the lawsuit was commenced back in 2000.

---

[5] Section 415(a) of the Federal Telecommunications Act states that "[a]ll actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(a). Section 415(b) states the statute of limitations for the recovery of damages rather than overcharges: "All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section." 47 U.S.C. § 415(b). As to when a cause of action accrues, Section 415(e) provides that "[t]he cause of action in respect of the transmission of a message shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after." 47 U.S.C. § 415(e). According to the Third Circuit, "the statute of limitations for purposes of § 415(a) accrues with 'discovery of the right or wrong or of the facts on which such knowledge is chargeable in law.'" <u>MCI Tele-communications Corp. v. Teleconcepts, Inc.</u>, 71 F.3d 1086, 1100 (3d Cir. 1995) (quoting <u>Central Scott Tel. Co.</u>, 832 F.Supp. at 1320).

Defendant charges that these claims too should be dismissed because they are barred by the statute of limitations, but the record is too sparse for the Court to make this determination.  The only information the Court has about the Wholesale Agreements is that at least one of the agreements was entered into in October 2001, that by August 2003, defendant was in arrears on the Wholesale Accounts, and that the Second Amended Complaint was filed in August 2004. Without a further developed record, the Court cannot now determine whether defendant has a valid statute of limitations defense to Counts IV through VIII.

C.      The Settlement Agreement

Defendant's last argument is that plaintiffs' claims are barred by the Settlement Agreement.  On February 29, 2000, MCI International, Inc., ("MCII"), formerly known as TC, entered into a settlement agreement with defendant to settle claims that were based upon activities that occurred prior to September 14, 1998.  The activities that formed the basis for the Settlement Agreement were four separately identifiable causes of action that were, in turn, based upon various agreements.  The first case is Graphnet, Inc. v. MCI International, Inc., No. 93-2046 ("Graphnet I"), commenced on or about May 17, 1993, in which Graphnet instituted a civil action against MCII in this district, alleging *inter alia* that MCII violated the antitrust laws. The second case is Graphnet, Inc. v. MCI International, Inc., (FCC File No. E-94-77), which is Graphnet's complaint with the Federal Communications Commission ("FCC"), challenging WUI Tariff FCC No. 22 on August 15, 1994.  The third case is MCI International, Inc. v. Graphnet, Inc., (FCC File No. E-96-37), begun on or about July 18, 1996, in which MCII filed a complaint with the FCC alleging violations under Sections 201(b) and 202(a) of the Communications Act, 47 U.S.C. §§ 201(b) and 202(a) (collectively referred to as "FCC Actions"). The fourth case,

Graphnet , Inc. v. MCI International, Inc., No. 96-2637 ("Graphnet II."), is a civil action against MCII in this district, alleging *inter alia*, nonpayment for indirect and direct telex traffic based on tariff rates contained in Graphnet Tariff FCC No. 5.  MCII counterclaimed, alleging, *inter alia*, nonpayment for indirect and direct telex traffic based on a 1992 intercarrier agreement between Western Union International, Inc. ("WUI"), now known as and hereinafter referred to as WorldCom International Data Services ("WIDS") and Graphnet.   The agreements underlying the dispute in Graphnet I  and the FCC Actions, two of the actions that led to the Settlement Agreement, are agreements between TC and defendant and the underlying issue in Graphnet II is an agreement between WIDS and defendant. (Nicholas Iacovano Decl.).

In support of its position that plaintiffs' claims are barred by the Settlement Agreement, defendant relies on Paragraph 1.1 of the agreement which states that it "applies to all telex traffic . . . ."  The release provisions of the agreement, however, provide:

> MCII, WUI, and their predecessors, successors, parents, subsidiaries, and affiliates hereby release and forever discharge Graphnet, GIC, and/or their predecessors, successors, parents, subsidiaries, affiliates, assigns, transferees, agents, directors, officers, employees, shareholders, attorneys, current and former directors, officers, employees, and shareholders from and against all actions, causes of action, claims, suits, debts, liens, damages, judgments, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether known or unknown, that they now have or may have had, or hereafter claims to have through the effective date of the tariff amendments set forth in Paragraph 1.3 of this Agreement, ***arising out of or relating to*** the FCC Actions, Graphnet I, Graphnet II and/or the GIC Account.

(Settlement Agreement at ¶ 3.1) (emphasis added).[6]

---

[6] Paragraph 3.2 is an identical provision whereby Graphnet releases MCII from claims it had against it.

A settlement agreement voluntarily and willingly entered into by parties is a binding contract and enforceable. <u>D.R. by M.R. v. East Brunswick Bd. of Educ.</u>, 109 F.3d 896, 900-901 (3d Cir. 1997).  "Generally, 'courts should enforce contracts as made by the parties.'" <u>Marchak v. Claridge Commons, Inc.</u>, 134 N.J. 275, 281 (1993) (quoting <u>Vasquez v. Glassboro Serv. Ass'n</u>, 83 N.J. 86, 101 (1980)).

At the hearing, defense counsel admitted that there is a dispute between the parties whether the claims asserted by plaintiffs in this action arise out of or relate to the actions mentioned in the Settlement Agreement.  Because that is a genuine issue of material fact, the Court denies defendant's motion for summary judgment on this ground.

## CONCLUSION

In conclusion, plaintiffs' motion to dismiss the Counterclaim and Third Party Complaint is granted in part and denied in part.  Defendant's claims that arose before April 20, 2004 are dismissed and those arising after that date survive.  Defendant is granted leave to amend its Fifth Count to the extent it can state a claim for fraud that arose after April 20, 2004.  Defendant's motion to dismiss the Second Amended Complaint, or in the alternative, for summary judgment is denied.


May 10, 2005


**s/William H. Walls**
United States District Judge


-36-

**Appearances**

Patrick C. Dunican, Jr.
Mark W. Stoutenberg
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 07102

Marc J. Gross
Jeffrey A. Sirot
Greenbaum, Rowe, Smith & Davis LLP
6 Becker Farm Road
Roseland, NJ 07068

Francis L. Young
126 C Street, N.W.
Washington, D.C. 20001